IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 14, 2015

**STATE OF TENNESSEE v. RICKY HOPSON**

**Appeal from the Criminal Court for Shelby County**
**No. 1300302     James M. Lammey, Judge**

_____

**No. W2014-01718-CCA-R3-CD  -  Filed August 26, 2015**

_____

Defendant, Ricky Hopson, was convicted by a Shelby County jury of aggravated assault, a Class C felony.  He received a sentence of ten years which was suspended and ordered to be served on probation.  On appeal Defendant contends that the evidence was insufficient to support his conviction because he acted in self-defense at the time of the offense.  After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right, Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

Stephen Bush, Shelby County Public Defender; and J.T. Harris and Harry E. Sayle, III, Assistant Public Defenders, Memphis, Tennessee, for the Appellant, Ricky Hopson.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Amy Weirich, District Attorney General; and Bryce Phillips, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Facts**

The victim, James Taylor, testified that because he had suffered several strokes, he could only walk short distances, and he used a wheelchair.  At approximately 6:00 p.m. on September 28, 2012, he used his wheelchair to travel to the Mapco located at Linden Avenue and Danny Thomas Boulevard in Memphis to buy some lottery tickets.  When he went inside the store, the victim placed his bags of aluminum cans that he had collected outside of the door. The victim was in the store for approximately one and a half minutes,

and when he exited the store he saw Defendant picking up the bags of cans and placing them in a trash can. The victim told Defendant to put the cans down, and Defendant began cursing him and calling him bad names. The victim testified:

> So I think I kind of raised up some out of my chair, but then I sat back down. Then he just said oh, you jumping all up at me? Then he went to leaning on me and then he said that he'll do so-and-so.

The victim denied that he hit Defendant in the back as Defendant walked away. The victim indicated that Defendant grabbed him by the throat with both hands. He further testified: "And you know so I was kind of tilted back, so he just kept pushing and pushing, so I told him you need to move your hands off me." Several bystanders also told Defendant to remove his hands from the victim. The victim testified that he experienced pain, and he believed that Defendant was trying to hurt him. He said:

> So I went on. I had my hands up there. So I pulled him onto me because he had me all the way kind of back. So I eased back in my pocket. That's when I come out with a pocket knife. And I asked him a couple of times still to turn me loose, but he never turned me loose. He kept choking.

The victim testified that Defendant continued choking him "harder" and "harder," so the victim began punching Defendant. The victim was having trouble breathing, and he stabbed Defendant a couple of times with the knife. Defendant then grabbed the victim's hand so that the victim could not continue to stab him. The Defendant continued choking the victim with his other hand. The victim said that he was in fear for his life.

The victim testified that a Housing Authority police officer arrived and told the victim to drop the knife. The victim did not drop the knife because Defendant continued to choke him. When Memphis Police Department officers arrived, the victim threw down the weapon. The officers then pulled Defendant off of the victim. The victim testified that during the altercation Defendant was "foaming at the mouth and everything." He said that as the officers took Defendant to a patrol car, Defendant "turned around and he hollered I'm going to kill you, I'm going to kill you. He said it over and over."

On September 28, 2012, Celia Jones was working at the Mapco located at 272 Danny Thomas Boulevard. She testified as follows concerning the offense in this case:

> A regular customer of ours, he's [the victim] in a wheelchair, he came in the store. He got a - - he's in a Hoveround. He had some bags on the

2

back of his chair.  And they didn't permit him to come in the store, so he left his bags on the door, the entry doors.  As he was leaving, a gentleman walked past.  He's normally in the area.  He [goes] through the garbage and whatnot.  And he was in his bags and he was like get out of my bags.  And you know, they started arguing and - -

.    .    .

Like I said, [Defendant] had been in his bags and they started [ ] arguing.  And a guy - - well he told the guy in the wheelchair I'll f---k you up.  And the guy who [was] in the little Hoveround, he had a cane on his wheelchair as well.  He had motioned like I'll knock your head off.  If you put your hands on me, I'm going to knock your head off.  So when [Defendant] went - - and he went to like he was leaving and fixing to walk off.

Ms. Jones specifically testified that the victim had his cane for protection.  When the victim put his cane away in the back of the Hoveround, Defendant walked over and began choking the victim with both hands.  Ms. Jones testified that Defendant was "choking the life" out of the victim, and the victim then stabbed Defendant with a pocket knife.  Ms. Jones called police, and a co-worker flagged down a Housing Authority officer.  When officers arrived on the scene, Defendant was still choking the victim, and the victim was stabbing Defendant.  Ms. Jones testified that the police told the victim to drop the knife, and the victim complied; however, Defendant continued choking the victim.  She said the officers "had to make [Defendant] stop choking [the victim]."  Ms. Jones testified that Defendant "went ballistic" when officers placed Defendant in a patrol car, and he tried to kick the windows out of the car, and he was threatening everyone.  Ms. Jones felt that Defendant would have choked the victim to death if the victim had not used his knife.  She also noticed that Defendant was "foaming at the mouth or whatnot."

Officer Katrina Cobb of the Memphis Police Department testified that when she arrived on the scene, she saw Defendant standing over the victim and choking him with both hands and cursing him.  She said that Defendant also threatened to kill the victim.  Officer Brian Rickett, a Housing Authority officer, had already arrived on the scene and was ordering the victim to drop the knife.  Officer Cobb testified that she also ordered the victim to drop the knife.  She and other officers had to pull Defendant off the victim, who then discarded the knife.  Officer Cobb testified that Defendant was combative, and other officers arrived to help place him in a patrol car.  She said, "[Defendant] was kind of hitting the window of the squad car, kind of spitting on the windows, cussing at us, saying he was going kill us."  Officer Cobb also testified that Defendant was "kind of

foaming at the mouth." She spoke with various individuals on the scene and learned that Defendant was the initial aggressor in the altercation.

Officer John Jackson testified that when he arrived on the scene, Defendant was highly agitated. He said:

> [Defendant] was making threats to the individual that he got into it with, threats to kill him. And eventually, he started making threats towards the officers about what he was going to do to us. And then it was odd he kept - - he was like foaming at the mouth. I didn't understand what that was about.

Officer Jackson testified that after Defendant was handcuffed and placed in a patrol car, he began kicking the windows, banging his head against a window, and kicking the door. He also refused to cooperate with ambulance personnel who attempted to treat his stab wounds.

Officer Brian Rickett testified that he was flagged down by a Mapco clerk on September 28, 2012. When he pulled into the Mapco parking lot he saw the victim, who was in a wheelchair. Defendant was standing over the victim, and the two appeared to be in "some kind of tussle or fight or something like that." Officer Rickett walked over and saw that Defendant was "laid across the top" of the victim and holding onto the victim's right hand. Officer Rickett also saw a pocket knife in the victim's right hand, and he ordered the victim to drop the knife. The victim agreed to drop the knife when Defendant stopped choking him. Officer Rickett called for additional officers, and he and the other officers who arrived eventually pulled Defendant off the victim, and the victim dropped the knife. Officer Rickett noted that after the victim dropped the knife, Defendant was still holding the victim's clothing and pushing on his face. It was determined that Defendant was the initial aggressor. Officer Rickett testified that after Defendant was taken into custody he became increasingly irate and threatened to kill the victim and the victim's family. Defendant also threatened to make the victim suffer. Officer Rickett testified that "[b]asically, at one point or another, [Defendant] threatened everyone out there." He said that Defendant was "volatile in his appearance," acting like a wild man and foaming at the mouth.

Sergeant Joseph Benya of the Memphis Police Department, Felony Response Division, arrived on the scene to investigate the case. He interviewed witnesses and concluded that Defendant was the primary aggressor. When asked how he came to the conclusion, Sergeant Benya testified:

4

Under the State's statute, choking is an aggravated assault in the State of Tennessee. The victim did not have an avenue of escape. The suspect was seen by officers choking from behind the victim that was in the wheelchair, Mr. Taylor. The victim - - the suspect had many avenues of escape at any time, even just prior to being stabbed by [Defendant]. He never chose an avenue of escape. He was the primary aggressor. He continued the attack up to and after he was being stabbed.

Defendant testified that prior to the incident in this case he was going inside Mapco to purchase a lottery ticket. He noted that he sometimes helped out at the store by emptying the trash and cleaning the parking lot, and certain clerks would give him a few dollars. Defendant testified that on September 28, 2012, he noticed a black garbage bag sitting by the front door of the store, and he placed it in the trash can. Defendant testified:

Next thing I know, [the victim] came out the door and said man, get my damn bag out the garbage. I said oh, wait a minute. I said that's the way to ask a person something, man? I said man, matter of fact, get your own damn bag out of the garbage. You know, that's what I said and then I turned around and finished smoking my cigarette. Put it out, walked toward the door, grabbed the door, he hit me in the back. I grab him and I turned around and I choked him. At the time I looked down, you know, I seen a knife in his hand. Then the guy said - - the other guy in the wheelchair said you bleeding. I said I'm bleeding? Then I grabbed his other hand and pressed it down and I reached across and said I'm going to kill your bitch ass.

Defendant testified that when he grabbed the victim's neck with one hand, it was weak and "flimsy," and he let go and grabbed the victim's hand. Defendant said that he was very angry because the victim struck him in the back as he turned to walk into the store. He testified that he never saw the victim with a cane. Defendant testified that he held onto the victim's "knife hand" with his left hand. He said that he was holding both of the victim's arms down when Officer Rickett saw him leaning over the victim. He thought that he held the victim down for three to five minutes. Defendant testified that he got upset when he was taken into custody because he was the victim.

Defendant testified that he had an encounter with the victim at Liberty Cash approximately two months before the assault. He said that he was helping the new owners of the business clean old meat out of a freezer when the victim and another man also asked the owners if they could help. The owners then asked Defendant if he

5

needed help cleaning out the freezers, and Defendant said no. Defendant thought that the victim and the other man got upset because he did not need their help. Defendant testified that he was not high on cocaine at the time; however, he admitted that he had been smoking crack cocaine earlier in the day.

**Analysis**

Defendant argues that the evidence presented at trial was not sufficient to support his conviction for aggravated assault because he was acting in self-defense and was stabbed by the victim. We disagree.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

An assault is defined, as relevant to this case, as:

> (1) . . . , knowingly . . . causes bodily injury to another; [or]

> (2) . . . knowingly causes another to reasonably fear imminent bodily injury....

T.C.A. § 39-13-101(a)(1)-(2). Tennessee Code Annotated section 39-13-102, which is the statute codifying aggravated assault, provides:

6

(a)(1) A person commits aggravated assault who:

(A) . . . knowingly commits an assault as defined in § 39-13-101, and the assault:

...

 (iv) Was intended to cause bodily injury to another by strangulation or bodily injury by strangulation was attempted; or

...

(2) For purposes of subdivision (a)(1)(A)(iv) "strangulation" means intentionally impeding normal breathing or circulation of the blood by applying pressure to the throat or neck or by blocking the nose and mouth of another person.

Whether a defendant acted in self-defense is a jury question. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). When considering self-defense, a jury must consider "whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." *State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995).

In this case, the victim testified that Defendant began cursing him and choking him after the victim told Defendant to put down a bag of cans that belonged to the victim. The victim testified that Defendant grabbed him by the throat with both hands, and he experienced pain. He believed that Defendant was trying to hurt him. It was not until Defendant failed to release the victim that the victim pulled a knife from his pocket and stabbed Defendant. Even after being stabbed, Defendant continued choking the victim until police arrived and pulled Defendant off the victim. The victim specifically testified that he was in fear for his life, and he had difficulty breathing. Several witnesses heard Defendant say that he was going to kill the victim and the victim's family.

Celia Jones, a Mapco employee, witnessed the incident and verified that Defendant was the initial aggressor. She said that Defendant told the victim "I'll f - - - k you up, and then appeared to be walking away when the victim took out his cane. Ms. Jones testified that when the victim placed his cane in the back of his Hoveround, Defendant ran back to the victim and began choking him. She specifically testified that the victim had his cane out for protection. Ms. Jones testified that Defendant was "choking the life" out of the victim when the victim began stabbing Defendant. She felt

that Defendant would have choked the victim to death if the victim had not used his knife.

Officer Cobb saw Defendant choking the victim with both hands when she arrived on the scene, and Officer Rickett saw Defendant lying over the victim and holding onto one of the victim's hands. Both officers testified that they had to pull Defendant from the victim, and Defendant threatened to kill the victim. Officer Cobb and Sergeant Benya both testified that witnesses told them that Defendant was the initial aggressor in the altercation.

Although Defendant testified that the victim was the initial aggressor by hitting him in the back and then stabbing him and that he was not choking the victim when officers arrived, the jury chose to disbelieve his testimony as was its prerogative. This Court does not second-guess the weight, value, or credibility afforded to the evidence by the jury. We conclude that the evidence is sufficient to sustain the Defendant's conviction for aggravated assault.

_____
THOMAS T. WOODALL, PRESIDING JUDGE